## SMITH v. UNITED TRACTION & ELECTRIC CO.

(Supreme Court, Appellate Division, First Department. March 9, 1900.)

1. CONTRACT—CONSTRUCTION—BREACH.

An agreement between plaintiff's assignor and defendant reciting that defendant should, on foreclosure sale of certain property, furnish the money required to purchase the property, "at such price as may hereafter mutually be agreed upon," will be construed as calling on each party to use reasonable efforts to agree on a price which should be bid for the property; and, if defendant refused to make such efforts, such refusal would be a breach of his contract.

2. SAME—CORRESPONDENCE—CONSTRUCTION.

The effect to be given to correspondence between parties, introduced for the purpose of determining whether or not there has been a refusal to comply with the terms of a contract, is one of law, for the court, and should not be submitted to the jury.

3. SAME.

Defendant agreed with plaintiff to furnish the money required to purchase certain property at foreclosure sale, at a price thereafter to be agreed on. Prior to the sale, defendant's directors passed a resolution declaring that not over a certain sum should be bid, and transmitted a copy of the resolution to plaintiff. Plaintiff, by letter, stated that he was not satisfied with the amount fixed. Defendant answered that it stood ready to carry out the original agreement. Plaintiff wrote that defendant could not, if necessary to secure the property, bid less than an amount stated, which was greatly in excess of the amount fixed by the directors. The contract contemplated the reorganization of the company owning the mortgaged property, of which plaintiff owned a majority of the stock. The letter stated that the essential part of the agreement was that defendant should buy at the sale for the lowest amount practicable, and that the details of the reorganization were the only matters left to subsequent mutual agreement. *Held* to show a refusal by plaintiff's assignor to negotiate as to the price to be paid. and not to show that defendant had refused to negotiate, or had arbitrarily fixed a limit for the amount which it would bid.

Appeal from trial term, New York county.

Action by David N. Smith against the United Traction & Electric Company. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Albert Stickney, for appellant.

John E. Parsons, for respondent.

RUMSEY, J. The plaintiff, as the assignor of Homer M. Daggett and others, made a contract on the 14th of December, 1893, with the defendant, which he alleges the defendant has refused to perform, and this action is brought for damages for such refusal. Daggett and his associates were interested in the Interstate Street-Railway Company, which owned and controlled the street railways in the neighborhood of the city of Pawtucket, R. I. In May, 1893, Daggett and his associates had entered into a contract with the defendant looking to the purchase by the defendant of a controlling interest in the shares of the Interstate Railway Company. By means of such ownership the defendant would secure full control, not only of the Interstate

Company, but of the other companies, the major part of whose stock was held by the Interstate Company. The May contract was never carried into effect, but was expressly abrogated by the agreements of December 14, 1893, hereafter referred to. Those agreements are five in number. They were made for the purpose of enabling the defendant to become the owner of the railways controlled by the Interstate Company, through the foreclosure of mortgages on those roads. They provided for the purchase of the property, the distribution of the purchase money on the foreclosure, and for the final control and management of the roads when they should have been bought. The particular agreement for the breach of which this action is brought seems to have been the first of the series, and is called the "Reorganization Agreement." It is alleged in the complaint that that agreement provided that the parties should co-operate to effect a foreclosure sale of the property of the Interstate Company under its mortgage, and the transfer thereof to some new corporation to be organized for the purpose, and that the defendant, the United Traction & Electric Company, should at any foreclosure sale of the Interstate Company furnish such cash as might be necessary to purchase the property of that company at that sale. One of the breaches of the contract alleged is that the defendant did not furnish such amount of cash as might be required to purchase the property of the Interstate Company at such sale. It is further alleged that the defendant arbitrarily and in bad faith fixed upon the sum of $100,000 as the outside limit which it would bid for the property of the Interstate Company, and on $50,000 as the outside limit which it would bid for the North Attleboro & Wrentham Railway Company, and that the defendant entered into an arrangement with one of its own directors to violate the reorganization agreement by declining to offer any reasonable, adequate price for the properties, and in that way to sacrifice and destroy the rights of Daggett and his associates. It is further alleged that the defendant refused to bid a greater sum than that above mentioned, and permitted the roads to be bid off by the director (Perry) above referred to for the sum of $101,000 and $51,000, respectively, which were sums far below, and known to the defendant to be far below, the actual value of the property. Thus, the gist of the action is that the defendant, having agreed to furnish such an amount of cash as might be necessary to purchase the property at the foreclosure sale, did not do so, but fixed the amount which it would bid at a sum much less than the value of the property; that its act in that regard was arbitrary and in bad faith, for the purpose of enabling its own directors to bid off the property at much less than its real value, and thereby destroy the interest and rights of the plaintiff's assignors.

The contract relied upon by the plaintiff was put in evidence. It did not call upon the defendant absolutely to furnish the cash required to bid off the property at the foreclosure sale, and so it might be sufficient to say that for that reason the cause of action was not proved by the plaintiff. But upon the trial he does not seem to have been strictly held to that allegation. He was permitted to endeavor to establish that there was a refusal on the part of the defendant

to perform terms of the contract, and the case was decided by the court below upon the theory that the terms of the contract were not such as were set out in the complaint, and the complaint was dismissed because the plaintiff failed to show that the defendant refused to perform the contract according to the terms appearing in that instrument.   The contract provided that the parties should co-operate to effect the foreclosure of the Interstate Company under its mortgage, and the transfer of its property to some new corporation to be organized for that purpose, in such manner and on such terms as might be practicable, and as might be from time to time during the process of such reorganization mutually agreed upon by and between the parties.   To that end, the contract contained a provision that the defendant should at the time of the sale of the Interstate Company property furnish such amount of cash as might be required to purchase that property, "at such price as may hereafter mutually be agreed upon by and between the parties hereto to have bid upon the same."   Thus, it will be seen that the contract did not require the defendant absolutely to furnish such amount of money as was necessary to bid in the property at the foreclosure sale, but such amount as should thereafter be agreed upon between the parties to the contract.   It is suggested by the defendant that the contract was not a completed one, but was simply, in that regard, an agreement to agree upon the price; and, in the absence of a final agreement as to price, no action could lie for the failure to bid the property in at a price. We think, however, that the contract should not be quite so strictly construed, but it may fairly be interpreted as calling upon each party to use reasonable and fair efforts to agree upon a price for which the property would be bid off on the sale; and if the defendant refused to make reasonable efforts to agree or to consult or negotiate with the plaintiff's assignors, and so refused in bad faith, with the intent that it should not be put in a position to bid off the property, because no price was agreed upon, such conduct would be a violation of its agreement, for which it might be held liable in damages.   But, giving the contract that construction, it is clear that, before the plaintiff could sue for the violation of the agreement, he must establish that the defendant refused to negotiate with the other parties for the purpose of fixing a price at which the property should be bid off.   Until such refusal was established, there could be no breach of the contract.   It could not be established simply by showing that there was no agreement made as to the price, but it would be necessary for the plaintiff to make it appear that the defendant actually refused to negotiate for that purpose when it was called upon to do so.   Neither party was required by the contract to open a negotiation.   They were to mutually agree, and it was sufficient for the defendant to hold itself ready to enter into negotiations when it was called upon to do so. The plaintiff was bound to show that the defendant, being called upon to make an agreement as to the price for which this property was to be bid off, refused to negotiate, or that any negotiation which it seemed to undertake was entered upon with the preconceived intention not to reach an agreement, from which it might be inferred that it was acting in bad faith, to the end that no agreement should be

reached, and as a consequence that the plaintiff's rights might be destroyed. What was done in that regard appears from uncontradicted testimony. Mr. Daggett, the plaintiff's assignor, who seems to have managed the matters in the interest of himself and his associates, testifies, substantially, that neither he nor his associates took the initiative in any of the negotiations as to price called for by the contract of December 14, 1893. He thought that they should come from the defendant, as it was the party to furnish the money. But that is a matter of no particular importance. It is undisputed that the first step between the parties by way of fixing the price was taken on the 18th of September, 1894. On the 3d of September the defendant's directors passed a resolution that it was the sense of their board that not over $50,000 should be bid for the Attleboro & Wrentham Company, and $100,000 for the Interstate Line. A copy of this resolution was on the 18th of September forwarded to the plaintiff's assignors, with a notice that the directors proposed to bid at the foreclosure sale the prices mentioned in it, and that, if they became the owners of the properties at those prices, they would reorganize them in accordance with the agreement. The letter also contained a statement that up to that time the defendant had made diligent efforts, but had failed, to reorganize the Interstate Railway Company in conjunction with the mortgage creditors of the said company.

It is urged by the plaintiff that it is reasonably to be inferred from this resolution that the defendant acted in bad faith, because, as he assumes, the letter is to be construed as an ultimatum on the part of the defendant, fixing the greatest price it would pay at the foreclosure, and that the price thus fixed was absurdly below the actual value of the property, and therefore he insists that there can be no escape from the conclusion that this act of the defendant was taken in bad faith. Just when that letter of 18th of September was received by Daggett and his associates does not appear, but an answer dated September 28, 1894, was sent, in which the plaintiff's assignors express themselves as ready and willing to do anything in their power to effectuate the agreement; and they ask for information regarding the efforts made for the reorganization, and the then present status. It is stated in that letter that "the agreement requires you, on the foreclosure sale, to cause a transfer to some new corporation, to be organized for that purpose, and, with that end in view, to bid in the property at the lowest amount which will secure at such sale for reorganization purposes." And that the statement of the defendant that it will bid at the foreclosure sale only up to $100,000 for the Interstate Line, and $50,000 for the Attleboro Line, "is not a compliance with your oral agreements and the said agreement of December 18th, 1893, if those figures fail to obtain the property." The attitude taken by the plaintiff's assignors in this correspondence is that they were not satisfied with the price fixed by the defendant as the amount to be bid. Their letter was replied to on the 15th of October by the defendant. It states therein that it had mentioned the amount which it proposed to bid, and which was satisfactory to it, and that it stood ready to carry out the agreement to bid at the foreclosure sale such price as might be fixed by the parties to the con-

tract. It is quite evident from this letter that the defendant had not yet violated the contract, but that it held itself ready to enter into negotiations on the subject of the price to be paid. The plaintiff's assignors sent another letter to the defendant on the 9th of November, in which the following passages occur:

"As the agreement of December 14, 1893, was executed in view of the cancellation of an agreement in which you had estimated the value of the property in question at largely over half a million dollars, it would seem clear to us that in carrying out the reorganization scheme, even if a limit could properly be placed by you as to the amount of your bid, you could not with propriety claim, for the purposes of reorganization, that the property was worth less than that amount,—in other words, while you are under obligation to get the property as cheaply as possible, you are certainly not in a position to claim that you can stop at any less amount than half a million; and, if our contention is correct, you would be obliged to bid any sum necessary to buy the property for reorganization purposes. This could not, in any event, be a hardship to you, as the Interstate property is admittedly worth much more to you than to any one else, because of the connections and facilities which you have. We have further to advise you that the essential part of the agreement being that you will buy at the sale for the lowest amount practicable, and the details being only matters left to mutual agreement as we understand it, we are willing, in any and every reasonable particular, to agree with you as to the details of the reorganization scheme,—viz. as to the amount of bonds, preferred stock, and common stock to be issued,—asking from you simply information from time to time as to what you are doing."

The only inference to be deduced from the extracts last quoted is, we think, that the plaintiff's assignors had fixed the price which, in their judgment, should be paid by the defendant at the foreclosure sale, and refused to enter into negotiations concerning it, although they were willing to negotiate as to other matters of detail mentioned by them. On December 12th the defendant wrote the plaintiff's assignors a letter which opens by saying that the communication of November 9th was received by the defendant in the latter part of the month of November, and it emphatically refuses to accede to the construction which the plaintiff's assignors placed upon the contract. In our judgment, the defendant was justified in that refusal. The defendant then proceeds to state reasons why no greater amount should be paid for the property than that fixed by it in the resolution of September 3d, and ends with a request to the plaintiff's assignors to agree to that amount as the amount to be paid. In our judgment, this letter of December 12th must be deemed to be, not a final refusal to agree upon the price, and as a final determination that no greater price would be paid than that fixed in the resolution, but only as a reiteration of its opinion that the amount mentioned in the resolution would be a proper amount, and as an invitation to the plaintiff's assignors to further negotiate on the subject. It cannot be said, therefore, that the defendant had refused to negotiate, or had arbitrarily and finally fixed an upset price above which it would refuse to bid.

The sale of the Attleboro & Wrentham property took place on the 14th of December, 1894. The defendant bid $50,000, as it stated it would, but the property was struck off to Perry for $51,000. The sale of the Interstate road did not take place until later. Before that road was put up for sale, and on the 11th of February, 1895, Daggett and his associates wrote another letter to the defendant, in which they

refer to the fact that the Attleboro road had been bought in by Perry; and they agreed to sign a consent that the Interstate road should be sold by a receiver, provided the defendant would stipulate to bid whatever was necessary to obtain the property. That proposition was refused by the defendant, and the sale of the Interstate Company took place in March, and was sold for $101,000; the defendant having bid $100,000, as it proposed to do. The question whether there was a violation by the defendant of the agreement of December 14, 1893, is to be determined by the construction to be given to the correspondence between the parties. That was purely a matter of law, for the court, and no question of fact could arise. In our judgment, the court properly construed the correspondence as a substantial refusal by the plaintiff's assignors to negotiate as to the purchase price, and as an insistence on their part that the defendant must bid whatever price was necessary to enable them to obtain possession of the property, and against counterbidding which might go to any amount. So construed, it was clearly a violation of the contract by the plaintiff's assignors, not only by insisting upon a construction of the contract which put it out of the power of the defendant to negotiate for the price, but also as a consistent and determined refusal to negotiate with a view of fixing the price to be paid. When it is considered that the duty was just as much upon the plaintiff's assignors as it was upon the defendant, and that the whole correspondence amounted to a refusal by the plaintiff's assignors to negotiate, it is quite clear that the judge was right in declining to send this case to the jury, and in ordering a verdict for the defendant.

The judgment must be affirmed, with costs. All concur.